**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EDWARD H.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 20-cv-3847** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey I. Cummings** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Edward H. ("Claimant") moves to reverse the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIBs"). The Commissioner brings a cross-motion for summary judgment seeking to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. §636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §405(g). For the reasons described herein, Claimant's motion to reverse the decision of the Commissioner, (Dckt. #19), is denied and the Commissioner's motion for summary judgment, (Dckt. #25), is granted.

## I.     BACKGROUND

### A.     Procedural History

On June 24, 2014, Claimant (then forty-one years old) filed an application for DIBs, alleging disability dating back to June 24, 2014, due to limitations stemming from congestive

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to plaintiff only by his first name and the first initial of his last name. Acting Commissioner of Social Security Kilolo Kijakazi has been substituted as the named defendant. Fed.R.Civ.P. 25(d).

heart failure and high blood pressure. (Administrative Record ("R.") 184). His claim was denied initially and upon reconsideration. (R. 749). Claimant filed a timely request for a hearing, which was held on September 20, 2016, before Administrative Law Judge ("ALJ") Nathan Mellman. (R. 35-74). On March 17, 2017, the ALJ issued a written decision denying Claimant's application for benefits. (R. 13-34). The Appeals Council denied review, and Claimant appealed to the U.S. District Court for the Northern District of Illinois. On April 2, 2019, the Honorable Mary Rowland granted Claimant's motion and remanded the case for further proceedings. *See Edward H. v. Berryhill*, No. 18 C 3637, 2019 WL 1454511 (N.D.Ill. Apr. 2, 2019). Pursuant to this order, the Appeals Council vacated the decision of the Commissioner and remanded the case to the original ALJ. (R. 881-86).

A second hearing was held before ALJ Mellman on January 7, 2020. (R. 777-816). The ALJ issued a second written decision on March 4, 2020, again denying Claimant's application for benefits. (R. 746-76). This action followed.

### B.    The Social Security Administration Standard to Recover Benefits

To qualify for disability benefits, a claimant must demonstrate that he is disabled, meaning he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i).

At step two, the SSA determines whether a claimant has one or more medically determinable physical or mental impairments. 20 C.F.R. §404.1521. An impairment "must result from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* In other words, a physical or mental impairment "must be established by objective medical evidence from an acceptable medical source." *Id.*; *Shirley R. v. Saul*, 1:18-cv-00429-JVB, 2019 WL 5418118, at *2 (N.D.Ind. Oct. 22, 2019). If a claimant establishes that he has one or more physical or mental impairments, the ALJ then determines whether the impairment(s) standing alone, or in combination, are severe and meet the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii).

At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, he is considered disabled, and no further analysis is required. If the listing is not met, the analysis proceeds. 20 C.F.R. §404.1520(a)(4)(iii).

Before turning to the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), or his capacity to work in light of the identified impairments. Then, at step four, the SSA determines whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake his past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform given his RFC, age, education, and work experience. If such jobs exist, the claimant is not disabled. 20 C.F.R. §404.1520(a)(4)(v).

### C.    The Evidence Presented to the ALJ

Claimant seeks DIBs due to limitations from congestive heart failure and high blood pressure.  The administrative record contains the following evidence that bears on his claim:

### 1.    Evidence from Claimant's Medical Record

Claimant was diagnosed with dilated cardiomyopathy in 2012.  (R. 655).  On March 5, 2014, he underwent a coronary angiogram and had a pacemaker and defibrillator implanted.  (R. 490, 554).  Claimant subsequently sought emergency medical attention for chest pain on August 30, 2014, and December 4, 2014.  (R. 482, 650).  On both occasions, studies did not reveal significant cardiopulmonary pathologies.  (R. 508, 629).  Claimant's physicians concluded that his symptoms were non-cardiac in nature.  (R. 507, 630) ("[T]here is no evidence of congestive heart failure at this time to explain any of his symptoms.").

Claimant presented to Rajesh Iyengar, MD, on March 18, 2016, to establish a primary care relationship.  (R. 667).  He complained of bilateral flank pain, but otherwise reported being generally healthy, with normal exercise tolerance and no chest pain.  (*Id.*).  On August 15, 2016, Claimant complained of occasional chest pain, aggravated by lifting or pulling, as well as shortness of breath, dizziness, and fatigue when walking.  (R. 659).  Claimant presented with no chest tenderness, and normal heart sounds and rhythm.  (*Id.*).  The doctor recommended that he adhere to his heart-related medication and stop smoking.  (R. 663).  At that same appointment, Claimant asked Dr. Iyengar to complete disability paperwork on his behalf.  Dr. Iyengar informed Claimant that "based on assessment he is still able to work as long as it's a light duty work."  (R. 660).

Claimant began receiving primary care treatment from Sarah Kidder, MD, on April 13, 2017.  (R. 998).  On May 30, 2017, Dr. Kidder described Claimant's congestive heart failure as

4

"stable," (R. 1008), and Claimant routinely denied dizziness, fatigue, chest pain, and shortness of breath during his appointments with her, (R. 1011, 1017, 1028, 1042, 1056). Dr. Kidder routinely observed Claimant to have a regular heart rate and rhythm. *See, e.g.,* (R. 1018, 1023, 1028, 1036). Due to Claimant's reports of "very high stress, depression, and anxiety," Dr. Kidder diagnosed him with situational depression. (R. 1002).

Claimant began treating with cardiologist Subir Shah, D.O., at Loyola University on June 5, 2017. (R. 1180). At that time, Claimant informed Dr. Shah that he had been experiencing atypical chest pain with palpation for several days. (*Id.*). Dr. Shah's examination revealed a normal heart rate, regular rhythm, normal and intact distal pulses, no gallop, no distant heart sounds, no friction rub, no opening snap, and no murmur. (R. 1181). Dr. Shah recommended that Claimant continue with his current medications and return for a follow-up in three months. (R. 1182). On August 6, 2018, Claimant asked Dr. Shah to complete paperwork so that Claimant could receive disability funds. (R. 1124). In his treatment notes, Dr. Shah wrote the following:

> I discussed with him in deep detail that he, from my perspective, is not disabled. While his EF is low, he is fully functional. [Patient] did state he does get dizzy at times and I discussed that while this is an issue and that I could fill out a form that he would need breaks during the day. However, the form is asking if he is disabled enough to not be able to work [twenty] hours a week and I discussed with him that he in fact could do this.

(*Id.*). After Claimant became upset, Dr. Shah agreed to complete a form stating that Claimant could not work up to twenty hours per week for six months. (*Id.*). Dr. Shah also suggested that Claimant could be placed in a "cardiac rehab program to build up his strength," but Claimant declined to sign up for the program. (*Id.*).

### 2.    Opinions from Treating Physicians

Cardiologist Samer Abbas, M.D., began treating Claimant on October 9, 2012. (R. 684). He completed an "Attending Physician's Statement" on Claimant's behalf on July 22, 2014.

5

Therein, Dr. Abbas opined that Claimant had severe congestive heart failure with hypertension. (R. 684). He classified Claimant's functional capacity as "Class III" in the New York Heart Association ("NYHA") scale, meaning Claimant was markedly limited due to his heart failure.[2] (*Id.*). Dr. Abbas noted that Claimant could not sit, stand, or walk for long periods of time, nor could he engage in strenuous activities, heavy lifting, or stressful situations. (R. 685). He concluded that Claimant was "totally disabled" from all work. (R. 684).

Dr. Iyengar also completed a treating source statement for Claimant on August 10, 2016. He opined that Claimant would be off task for ten percent of the workday and absent three days per month. (671). He found that Claimant could sit for seven hours per eight-hour workday, stand or walk for two hours per eight-hour workday, and walk more than 100 feet without assistance. (R. 672-673). According to Dr. Iyengar, Claimant could occasionally balance, stoop, kneel, and crouch; rarely climb stairs and ramps; and never crawl or climb ladders. (R. 673-74).

Claimant began treating with cardiologist John M. Burke, M.D., in November 2015. (R. 679). On August 15, 2016, Dr. Burke completed a cardiac medical source statement on Claimant's behalf. He classified Claimant's condition as NYHA class II. (R. 679). He further opined that Claimant could sit, stand, and walk for only two hours per an eight-hour day and would require one unscheduled thirty-minute break every day. (R. 680). According to Dr. Burke, Claimant could occasionally lift ten pounds, twist, stoop, bend, crouch, and climb stairs.

---

[2] The NYHA is the most commonly used classification system for documenting the severity of heart failure symptoms. Class I patients have no limitation on physical activity. Class II patients are described as follows: "Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath)." Class III patients are described as follows: "Marked limitation of physical activity. Comfortable at rest. Less than ordinary activity causes fatigue, palpitation, or dyspnea." Finally, Class IV patients are "unable to carry on any physical activity without discomfort" and experience symptoms of heart failure even when at rest. American Heart Association, "Classes of Heart Failure" (Last Accessed Nov. 7, 2022), https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure.

(R. 681). He would be off task for ten percent of each workday and absent four days per month. (R. 682).

Joseph Cytron, MD, began treating Claimant in June 2017. (R. 1834). On November 25, 2019, Dr. Cytron wrote a letter on Claimant's behalf. In it, he classified Claimant's condition as NYHA class III due to his "limited ability to keep up with daily activity." (R. 1834). Dr. Cytron wrote that "frequent lifting of more than [fifteen to twenty] pounds poses a potential risk with the arm on the side of his implanted ICD. Moreover, while low level cardiopulmonary exercise is encouraged, lifting weights and heavy resistance exercise should be avoided given his nonischemic cardiomyopathy." (*Id.*). He noted that Claimant experienced frequent "dizziness / lightheadedness, hampering his ability to commute," and theorized that Claimant "would be considered a difficult person to employ" due to his "restrictions on lifting, repetitive motion with the left arm, inability to walk more than [forty] feet without shortness of breath or fatigue, need for frequent doctor visits and ongoing medication adjustment." (R. 1836).

### 3. Consultative Examiner Findings

Liana G. Palacci, D.O., conducted an internal medicine consultative examination of Claimant on January 27, 2015. Dr. Palacci heard no "rubs, clicks, or murmurs" in Claimant's heart, but noted that his heart rate was "somewhat irregular." (R. 656). Claimant presented with normal grip strength, a non-antalgic gait without the use of assistive devices, a negative straight-leg test, and a normal range of motion in the shoulders, elbows, wrists, hips, knees, ankles, and spine. (*Id.*). Claimant demonstrated five out of five strength in his upper and lower extremities as well as intact sensation. (*Id.*). He could heel-and-toe stand and perform knee squats. (*Id.*).

Fauzia A. Rana, M.D., provided an internal medicine consultative report on April 18, 2019. During the examination, Claimant demonstrated no difficulty breathing or difficulty in

various movements, (R. 1700), although Claimant's right upper chest was sensitive to touch and his heart sounds were irregular. (R. 1701). Claimant also presented with no joint limitation and five out of five grip strength. (*Id.*). He could perform fine and gross manipulation with both hands, had a negative straight leg test, and demonstrated no difficulty when getting on and off the exam table, tandem walking, walking on toes, walking on heels, squatting and arising, and hopping on one leg. (R. 1701-02). Claimant had a normal gait and could walk more than fifty feet without assistance. (R. 1702). Dr. Rena concluded that Claimant could "sit, stand, lift, carry, speak, and hear without difficulty." (R. 1703).

### 3.    State Agency Consultants' Opinions

State agency consultant David Mack, M.D., reviewed Claimant's file on February 19, 2015. He found that Claimant could frequently lift or carry ten pounds, stand or walk for two hours per day, and sit for six hours per day. (R. 79). He found that Claimant should avoid concentrated exposure to hazards and limited Claimant to sedentary work. (R. 80-81). State agency consultant Bernard Stevens, M.D., reviewed Claimant's file on May 19, 2015. He found the same exertional limitations as Dr. Mack, but added that Claimant should avoid concentrated exposure to extreme cold, extreme heat, and humidity, but could have unlimited exposure to hazards. (R. 90).

### 4.    Evidence from Claimant

In a February 23, 2015 function report, Claimant stated that while he has no problem with personal care, he does not prepare his own meals, and does no household chores. (R. 203-04). He uses public transportation and can leave the house unaccompanied. (R. 205). He does not drive because he does not have a car. (*Id.*). Claimant goes shopping for thirty minutes to an hour and he goes to church on Sundays. (R. 205-06). He can walk half a block before feeling

lightheaded and can lift five to ten pounds. (R. 207). In a March 11, 2015 function report, Claimant reported that he prepares his own meals, such as sandwiches, and completes household chores such as laundry, sweeping, mopping, doing the dishes, and taking out the trash. (R. 221). He shops for two and a half hours at a time. (R. 222).

At the January 7, 2020 hearing, Claimant testified that he no longer uses public transportation because he is scared of someone bumping into him. (R. 785). He does not do any chores around the house. (R. 786).

**D.    The ALJ's Decision**

The ALJ applied the five-step inquiry required by the Act in reaching his decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity during the period between his alleged onset date of June 24, 2014, and his date last insured of December 31, 2019. (R. 752). At step two, the ALJ determined that Claimant suffered from the severe impairments of congestive heart failure with a history of dilated cardiomyopathy status post defibrillator; atrial fibrillation status post ablations; depression; and anxiety. (*Id.*). At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments. (R. 753). The ALJ found that Claimant's impairments caused no limitation in understanding, remembering, or applying information; a mild limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and no limitation in adapting or managing himself. (R. 754-55).

Before turning to step four, the ALJ determined that, through the date last insured, Claimant had the residual functional capacity ("RFC") to perform less than the full range of sedentary work with the following limitations:

9

He has no limitations regarding his ability to sit. He can stand for one hour in a typical eight-hour workday and walk for less than five minutes at a time for no more than [thirty] minutes total per day, such as to enter or exit the workplace, go to meetings, and go on breaks. He can frequently reach in all directions bilaterally. He can, on a less than occasional basis, climb ramps and stairs, such as to go to enter or exit the workplace, go to meetings, and go on breaks. He cannot climb ladders, ropes, or scaffolds. He can occasionally stoop, kneel, and crouch. He cannot crawl. He cannot work at unprotected heights, operate moving mechanical parts, or operate a commercial vehicle. He cannot work in weather, humidity, wetness, extreme cold, or extreme heat. He can occasionally tolerate work environments with dust and odors but should not work in environments with fumes or other pulmonary irritants. He should not handle objects that vibrate. He can perform simple, routine tasks in a low stress job, which I define as less than occasional decision-making required.

(R. 755-56). Based on these conclusions, the ALJ determined at step four that Claimant was not capable of performing past relevant work as a cleaner or a mixer operator. (R. 767). Even so, at step five, the ALJ concluded that a sufficient number of jobs existed in the national economy that Claimant could perform given his RFC, including the representative positions of telephone clerk, charge account clerk, and assembler. (R. 768). As such, the ALJ found that Claimant was not under a disability at any time from June 24, 2014, through December 31, 2019. (R. 769).

## II.    STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be

free from legal error. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, making independent symptom evaluations, or otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to his conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413.

## III. ANALYSIS

Claimant raises three arguments in support of remand. He asserts that: (1) the ALJ improperly assessed the opinions of treating physicians Drs. Abbas and Cytron; (2) the ALJ failed to adequately account for his mental limitations in the RFC; and (3) the ALJ's assessment of his subjective complaints was patently wrong. The Court disagrees on all counts.

### A. The ALJ's decision to discount the opinions of Claimant's treating physicians is supported by substantial evidence.

It is well-settled that "an ALJ need not blindly accept a treating physician's opinion." *Schreiber v. Colvin*, 519 Fed.Appx. 951, 958 (7th Cir. 2013). Instead, for claims – like this one – that were filed prior to March 27, 2017, the treating physician rule requires an ALJ to give a treating physician's opinion controlling weight only "if it is well-supported and not inconsistent

11

with other substantial evidence." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); *Givens v. Colvin*, 551 Fed.Appx. 855, 861 (7th Cir. 2013) ("An ALJ may discount even a treating physician's opinion if it is inconsistent with the medical record."); *see also Luster v. Astrue*, 358 Fed.Appx. 738, 740 (7th Cir. 2010) ("an ALJ may reject a treating physician's opinion . . . if substantial evidence in the record contradicts the physician's findings."). When an ALJ rejects a treating source's opinion, "a sound explanation must be given for that decision," *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011), and courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment," *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015); *Luster*, 358 Fed.Appx. at 740. "Once well-supported contrary evidence is introduced, . . . a treating physician's opinion becomes just another piece of evidence for the ALJ to evaluate." *Karr*, 989 F.3d at 511.

### 1. The ALJ adequately explained his decision to discount the opinion of Claimant's treating cardiologist, Samer Abbas.

In a July 2014 physician's statement, Claimant's treating cardiologist Dr. Abbas found that Claimant's functional capacity was markedly limited and concluded that Claimant was "totally disabled" from all work. (R. 684). Dr. Abbas further opined that Claimant could not sit, stand, or walk for long periods of time and was unable to engage in strenuous activities, heavy lifting, or stressful situations. (R. 685). In her order remanding the case, Judge Rowland found that the ALJ had erred in evaluating Dr. Abbas' opinion. *Edward H.*, 2019 WL 1454511, at *2. Claimant now alleges that the ALJ repeated this mistake on remand. (Dckt. #19 at 3).

The ALJ provided four primary reasons for assigning "little" – rather than "controlling" – weight to Dr. Abbas' opinion. (R. 763). First, he noted that Abbas' findings were vague. (*Id.*). Second, he observed that the opinion was rendered shortly after Claimant's alleged onset date and, therefore, did not account for the improvement shown elsewhere in the medical record.

(*Id.*).  Third, the ALJ found Dr. Abbas' opinions to be inconsistent with the opinions of other

physicians in the record.  For example, the ALJ reasoned that Dr. Abbas' statement that Claimant

was "totally disabled" was inconsistent with the findings of another treating cardiologist, Dr.

Shah, who found that Claimant was not disabled.  (*Id.*) (citing R. 1124).  The ALJ further noted

that Dr. Abbas' opinion that Claimant was in class III of the NYHA scale (indicating marked

limitations) was inconsistent with the findings of other treatment providers, who classified

Claimant as NYHA class II (suggesting mild symptoms), although Claimant had the same left

ventricle ejection fraction during both appointments.  (*Id.*) (citing R. 1100-01, 1205).  Fourth and

finally, the ALJ found Dr. Abbas' opinion regarding Claimant's limitations to be inconsistent

with other providers' treatment notes wherein Claimant denied dizziness, dyspnea, palpitations,

or significant fatigue when walking.  (R. 763) (citing R. 1100, 1728).

Claimant levels several criticisms at this analysis, which closely mirror the errors found

by Judge Rowland in 2019.  *Edward H.*, 2019 WL 1454511, at *3.  First, Claimant asserts that if

the ALJ felt Dr. Abbas' opinion lacked specificity, he should have contacted Dr. Abbas for

clarification rather than discounting his opinion for "vagueness."  (Dckt. #19 at 6).  It is well-

established, however, that an ALJ need only seek additional medical opinions when "the

evidence before [him] is insufficient to determine whether a claimant is disabled or if, after

weighing the conflicting evidence, [he] cannot reach a conclusion."  *Luna v. Shalala*, 22 F.3d

687, 693 (7th Cir. 1994); *see also Barnett v. Barnhart*, 381 F.3d 664, 669-70 (7th Cir. 2004)

(citing S.S.R. 96-5p at 2) ("[A]lthough a medical opinion on an ultimate issue such as whether

the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion

and should recontact the doctor for clarification *if necessary*.") (emphasis added).  Because the

other evidence before the ALJ was sufficient to make a finding regarding Claimant's disability

claim, he was not obligated to seek further information from Dr. Abbas. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) ("This court generally upholds the reasoned judgment of the Commissioner on how much evidence to gather."); *Ricky R. C. v. Comm'r of Soc. Sec.*, No. 18-cv-00444-MGG, 2020 WL 1061240, at *4 (N.D.Ind. Mar. 4, 2020) ("There is no doubt that the ALJ must ensure that the record is fully and fairly developed. However, Mr. C has not shown that the ALJ required clarification especially given the competing evidence the ALJ considered.") (citation omitted). Moreover, unlike in his prior assessment, the ALJ here offered several "good reasons" for discounting Dr. Abbas' findings aside from vagueness.

Claimant next asserts that the ALJ failed to explain *how* Dr. Abbas' opinion that Claimant was "totally disabled" was inconsistent with the medical evidence of record. (Dckt. #19 at 5) (citing *Perry v. Colvin*, 945 F.Supp.2d 949, 965 (N.D. Ill. 2013) ("[T]he act of summarizing the evidence is not the equivalent of providing an analysis of the evidence."). As noted above, however, the ALJ in this case highlighted three inconsistencies in his analysis: (1) Dr. Shah's opinion that Claimant was not disabled; (2) other physicians' findings that Claimant should be classified as NYHA class II; and (3) Claimant's own reports denying dizziness or fatigue. These examples distinguish the ALJ's analysis from his earlier opinion, in which he failed to "point to any inconsistencies directly," *Edward H.*, 2019 WL 1454511, at *4, and the ALJ properly considered them when evaluating Dr. Abbas' opinion. *See White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (rejecting "treating physician rule" argument where the ALJ found a physician's opinion to be "at least partially inconsistent with the conclusions of several other physicians"). [3]

---

[3] Claimant asserts that the ALJ could not rely on Dr. Shah's opinion that Claimant was "fully functional" to discount Dr. Abbas' findings because the ALJ rejected this opinion by finding that Claimant had "reduced functioning." (Dckt. #19 at 7) (citing R. 763). However, the ALJ did *not*

Finally, Claimant asserts that the ALJ erred by not properly considering the factors specified in 20 C.F.R. §404.1527(c) when deciding to give Dr. Abbas' opinion less than controlling weight. (Dckt. #19 at 4). The Court again disagrees. It is true that when an ALJ does not give a treating physician's opinion controlling weight, the regulations require him to "consider the length, nature, and extent of the treatment relationship, the frequency of examination, the physician's specialty, the type of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. §404.1527(c)); *Karr*, 989 F.3d at 512. However, an ALJ need not explicitly address each factor, so long as the factors are considered. *See Schreiber v. Colvin*, 519 Fed.Appx 951, 959 (7th Cir. 2013) ("[W]hile the ALJ did not explicitly weigh each factor in discussing Dr. Belford's opinion, his decision makes clear that he was aware of and considered many of the factors . . . .").

Here, the ALJ: (1) recognized Dr. Abbas' status as Claimant's treating cardiologist; (2) discussed the significance of the relatively early date in which Dr. Abbas issued his opinion in consideration of the entire course of Claimant's treatment; (3) identified the type of test that Dr. Abbas relied on (an echocardiogram); and (4) evaluated the consistency and supportability of Dr. Abbas' opinion. (R. 749, 763). By taking these steps, the ALJ properly evaluated Dr. Abbas'

---

rely on Dr. Shah's "fully functional" opinion to discount Dr. Abbas' findings, but rather on his finding that Claimant was "not disabled." (R. 763). Claimant also argues that the ALJ incorrectly characterized Dr. Shah's opinion as inconsistent with Dr. Abbas' because Dr. Shah's finding "that [Claimant] could perform part-time work [was] not inconsistent with a finding of disability." (Dckt. #19 at 7-8). But as Claimant himself notes, Dr. Shah "opined *only* that [Claimant] could work [twenty] hours a week," (*Id.* at 7), not that Claimant could *only* work twenty hours a week. This distinction is critical. Moreover, Dr. Abbas did not merely find Claimant disabled, but "totally disabled," which suggests that part-time work would also be precluded in his view.

opinion within the applicable regulatory framework. *Cf. Elder*, 529 F.3d at 415-16 (affirming the denial of benefits where the ALJ discussed only two of the relevant regulatory factors).

> ### 2. The ALJ afforded generally great weight – rather than little weight – to the opinion of Claimant's treating cardiologist, Joseph Cytron, and he adequately explained this decision.

Claimant next faults the ALJ for granting "little weight" to the November 2019 opinion of another treating cardiologist, Dr. Cytron. (Dckt. #19 at 8). Contrary to Claimant's argument, however, the ALJ afforded "generally *great* weight" to Dr. Cytron's findings and incorporated most of them into Claimant's RFC. (R. 764). Indeed, the ALJ disagreed only with Dr. Cytron's opinion that Claimant's "fatigue, shortness of breath, and other cardiac symptoms are disabling." (R. 764). The ALJ found this opinion to be inconsistent with three treatment notes from around the same time, which indicated that Claimant "displayed no wheezing, rales, or rhonchi," (R. 1864), could walk half a block without limitation, (R. 1886, 1916), and was NYHA class II, rather than class III, (R. 1887).

Although Claimant is correct that notes regarding Claimant's *breathing* abilities are not necessarily inconsistent with Dr. Cytron's findings regarding the extent to which Claimant's *heart condition* limited him, (Dckt. #19 at 9), the ALJ's latter observations provide the requisite logical bridge from the evidence to his decision to discount Dr. Cytron's conclusion. *See Schreiber v. Colvin*, 519 Fed.Appx. 951, 959 (7th Cir. 2013) ("While we may not agree with the weight the ALJ ultimately gave Dr. Belford's opinions, our inquiry is limited to whether the ALJ sufficiently accounted for the factors in 20 C.F.R. §404.1527 . . . and built an 'accurate and logical bridge' between the evidence and his conclusion.") (citation omitted).

Claimant also opines that there is "nothing inconsistent" with NYHA class II heart failure and the inability to walk only half a block. (Dckt. #19 at 9). But the ALJ never said that there

was.  Instead, he found Claimant's NYHA class II status to be inconsistent with Dr. Cytron's

finding that Claimant was disabled.  Because this classification indicates that Claimant's heart

failure caused only a "slight limitation of physical activity," *see* n. 2, *supra*, the Court finds this

interpretation to be reasonable, which is all that is required.

In any event, even if reasonable minds could differ as to the weight that Dr. Abbas' and

Dr. Cytron's opinions merited, the Court is not at liberty to substitute its judgment for that of the

ALJ by reweighing the evidence.  *Karr*, 989 F.3d at 513; *Young v. Barnhart*, 362 F.3d 995, 1001

(7th Cir. 2004).

**B.  The manner in which the ALJ accounted for Claimant's mental limitations
in the RFC is supported by substantial evidence.**

To account for Claimant's mental limitations, the ALJ found that he could "perform

simple, routine tasks in a low stress job," which the ALJ defined as "less than occasional

decision-making required."  (R. 756).  Claimant now argues that this RFC does not adequately

account for his mental limitations for two reasons: (1) a limitation to simple and repetitive tasks

is insufficient to address moderate limitations in concentration, persistence, and pace; and (2) the

ALJ failed to address whether Claimant required additional "off-task time."  (Dckt. #19 at 10).

Again, the Court disagrees.

An ALJ's RFC findings are intended to capture "the most [a claimant] can still do despite

[his] limitations."  20 C.F.R. § 416.945(a)(1); *see also Moon v. Colvin*, 763 F.3d 718, 720 (7th

Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014) ("Residual functional capacity is the

extent to which a person can still work despite having health problems.").  While Claimant is

correct that a limitation to simple and repetitive tasks *may* be insufficient to account for

limitations in concentration, persistence, and pace, *see Crump v. Saul*, 932 F.3d 567, 569-70 (7th

Cir. 2019) (citing cases), this restriction will nevertheless suffice if it accounts for the Claimant's

particular limitations. *See Recha v. Saul*, 843 Fed.Appx. 1, 4 (7th Cir. 2021) ("[A]n ALJ has

some latitude with the exact wording of an RFC as long as it conveys in some way the

restrictions necessary to address a claimant's limitations."). Accordingly, the Seventh Circuit

has "let stand an ALJ's hypothetical omitting the terms 'concentration, persistence and pace'

when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that

someone with the claimant's limitations would be unable to perform." *Moreno v. Berryhill*, 882

F.3d 722, 730 (7th Cir. 2018) (internal citations omitted). In other words, the question is

"whether an ALJ's decision adequately accounts for an applicant's limitations against the

evidence in the record before the ALJ." *Recha*, 843 Fed.Appx. at 4.

Here, the Court finds that it does. When assessing Claimant's mental limitations, the

ALJ noted that Claimant "often attributed his psychological difficulties to situational stressors

. . . rather than unpredictable or uncontrollable psychiatric pathologies." (R. 761). Accordingly,

restricting Claimant to "low-stress" work directly accounts for Claimant's particular

psychological limitations, which are triggered by stress. *See, e.g., Pytlewski v. Saul*, 791

Fed.Appx. 611, 616 (7th Cir. 2019) ("Although we often reject the idea that a hypothetical

confining the claimant to 'simple, routine tasks and limited interactions with others adequately

captures temperamental deficiencies and limitations in concentration, persistence, and pace,'

such a hypothetical may be adequate when it restricts a claimant with 'stress- or panic-related'

limitations . . . to low-stress work."); *see also Kuykendoll v. Saul*, 801 Fed.Appx. 433, 438 (7th

Cir. 2020) (restricting claimant to "simple work-related decisions" adequately accounted for

moderate CPP limitations that were tied to "stress, anger, or irritability"); *Jozefyk v. Berryhill*,

923 F.3d 492, 498 (7th Cir. 2019) (confining claimant to "routine tasks and limited interactions

18

with others" adequately accounted for CPP limitations where claimant's "impairments surface only when he is with other people or in a crowd").

The fact that no medical professional recommended any greater mental RFC restrictions further supports a finding that the ALJ's RFC adequately accounted for Claimant's impairments. *See, e.g., Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004) (finding an ALJ does not err when "there is no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ"); *see also Diana S. v. Kijakazi*, No. 19-cv-6344, 2022 WL 2316201, at *12 (N.D.Ill. June 28, 2022) ("Without evidence from a medical source that a certain impairment will limit the Claimant's functional capacity (or even allegations from Claimant to this effect), the Court will not fault the ALJ for failing to create limitations of [her] own.") (quotation and citation omitted). Indeed, the ALJ found *more* restrictions than the only medical professionals who rendered an opinion regarding Claimant's work-related mental restrictions – the state agency consultants – who found that Claimant's depression and anxiety were not medically determinable impairments. (R. 78, 88).

Claimant himself proffers only one restriction that might have better accounted for his moderate limitations in CPP: a restriction allowing him to be off task for more than fifteen percent of the workday. (Dckt. #19 at 12). But again, the ALJ was not obligated to provide for – or even discuss – such a restriction where no medical opinion in the record supported it. *See, e.g., Reynolds v. Kijakazi*, 25 F.4th 470, 471 (7th Cir. 2022) (where "no medical evidence" called for a limitation, "the ALJ was not required to intuit such a limitation from the administrative record"); *Spring W. v. Saul*, No. 20 C 1864, 2021 WL 2529615, at *6 n.5 (N.D.Ill. June 21, 2021) (where "no doctor opined that [claimant] would require an off-task time limitation . . . [claimant's] argument that the ALJ should have included an off-task time limitation, lacks

merit."); *see also Delong v. Saul*, 844 Fed.Appx. 894, 900 (7th Cir. 2021) ("Even if the record

could support [additional restrictions for breaks and off-task limitations], there is nothing that

compels them."); *Recha*, 843 Fed.Appx. at 5 (ALJ's RFC was adequate where claimant failed to

provide "any other credible medical evidence indicating that his symptoms required additional

RFC restrictions to account for CPP limitations beyond those included in the ALJ's decision").

Despite the lack of medical support for this off-task limitation, Claimant asserts that the

ALJ was required to address it in his RFC analysis because, during the hearing, he solicited

testimony from the VE regarding off-task behavior.  (Dckt. #19 at 11) (citing R. 809).  However,

an ALJ is "not required to discuss every response the VE gave to hypotheticals the ALJ

ultimately discarded."  *Clemente A. v. Saul*, No. 18-cv-6345, 2019 WL 3973117, at *5 (N.D.Ill.

Aug. 22, 2019) (citing *Winsted v. Saul*, 923 F.3d 472, 477 (7th Cir. 2019)).  Instead, "[t]he

Seventh Circuit has made it clear that the ALJ is only required to include limitations that are

supported by the record in the hypotheticals posed to the VE and in the RFC assessment."  *Id*.

(citing *Winsted*).  Consequently, an ALJ does not err by posing a hypothetical regarding an off-

task limitation to the VE and not addressing it in the RFC assessment where – as here – the

medical record does not support an off-task restriction.  *See Id.*, at *5; *Victoria R. v. Kijakazi*,

No. 20-cv-04444, 2022 WL 3543231, at *12 (N.D.Ill. Aug. 18, 2022); *cf. Hawist v. Berryhill*,

No. 17 cv 50126, 2018 WL 6399094, at *4 (N.D.Ill. Dec. 6, 2018) (where claimant had a

medically documented off-task limitation, the ALJ erred by not discussing VE's response to a

hypothetical concerning claimant's off-task behavior when formulating claimant's RFC).

### C.    The ALJ's assessment of Claimant's subjective complaints was not patently wrong.

Any challenge to the ALJ's symptom evaluation faces a high hurdle, as the Court will not

overturn the ALJ's credibility finding unless it is "patently wrong," meaning it lacks any

explanation or support in the record. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

Despite this deferential standard, Claimant argues that the ALJ in this case committed three

errors when assessing his alleged symptoms. First, Claimant asserts that the ALJ improperly

relied on Claimant's conservative treatment history. Next, he argues that the ALJ's discussion of

Claimant's daily activities was insufficient. Finally, Claimant argues that the ALJ improperly

relied on Claimant's failure to quit smoking to discount his claims regarding the severity of his

symptoms. Again, the Court disagrees.

### 1. The ALJ properly considered Claimant's conservative treatment history.

When explaining his finding that Claimant's "alleged symptoms related to his physical

conditions are not fully consistent with the medical evidence of record," the ALJ wrote the

following:

> The claimant's treatment history has been largely limited to conservative measures,
> primarily through medication management and medical monitoring, with few
> recommendations for more aggressive treatment modalities. This absence of
> aggressive treatment suggests that the claimant's physicians did not consider the
> claimant's physical conditions to be severe, especially to the degree that the
> claimant has generally alleged.

(R. 766).

As a general matter, "an ALJ is entitled to consider the routine and conservative nature of

a claimant's treatment in assessing the claimant's credibility." *Annette S. v. Saul*, No. 19 C 6518,

2021 WL 1946342, at *12 (N.D.Ill. May 14, 2021) (citing *Simila v. Astrue*, 573 F.3d 503, 519

(7th Cir. 2009)); 20 C.F.R. §404.1529(c)(3)(v). Although Claimant does not dispute this, he

argues that whenever an ALJ relies on conservative treatment, he must explain what alternative,

"aggressive" treatment methods would have been more consistent with the claimant's alleged

symptoms. (Dckt. #19 at 12-13). Contrary to Claimant's assertion, however, courts have

routinely deemed medication management to be a conservative course of treatment without requiring any explanation or context. *See Similia*, 573 F.3d at 519 (affirming adverse credibility finding based on claimant's "relatively conservative" treatment of "various pain medications, several injections, and one physical therapy session"); *Calvin B. v. Kijakazi*, No. 20 C 3404, 2022 WL 3018313, at *7 (N.D.Ill. July 29, 2022) (noting that the "[r]eceipt of conservative treatment is a legitimate reason to find a claimant not entirely credible, and here, Plaintiff received only routine medication management") (citation omitted); *Darlene C. v. Saul*, No. 19-cv-5059, 2020 WL 6447641, at *7 (N.D.Ill. Nov. 3, 2020) (finding the ALJ properly considered the claimant's "conservative treatment, which consisted of taking medications, wearing a cardioverter defibrillator and custom orthopedic shoes, and using foot ointment.").

Accordingly, an ALJ may properly discount a claimant's subjective complaints based on conservative treatment without theorizing what alternative procedures would be necessary were the condition more severe. *See Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022) (finding that the ALJ properly considered the claimant's lack of major surgery when evaluating her subjective complaints). Indeed, this type of speculation on the part of an ALJ would constitute "playing doctor," which, as Claimant notes, is impermissible. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("The ALJ impermissibly 'played doctor' and reached his own independent medical conclusion" concerning the level of treatment claimant should have received).

The Court also notes that the ALJ did not rely solely on Claimant's medication history to classify his treatment as conservative. He also observed that Claimant repeatedly went more than a year during his alleged disability period without seeking any medical treatment at all, aside from emergency care. (R. 758) (observing that the record contains no evidence of medical encounters between January 2015 and March 2016); (R. 1000) (April 2017 treatment note

indicating that Claimant had not seen a doctor in the last year aside from when he sought emergency treatment after being kicked in the chest). Claimant also declined to participate in a cardiac rehabilitation program recommended by his treating cardiologist, (R. 1124), and failed to comply with his treating providers' repeated orders to stop smoking, (R. 663). This evidence, too, supports the ALJ's finding that Claimant's treatment was conservative and inconsistent with his allegations of debilitating symptoms. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) (finding that the ALJ properly relied on claimant's treatment, which was "routine and conservative" in that "she sought medical treatment only seven times in the eight years she claims to have been totally disabled").

Most importantly, the Court notes that the ALJ *did,* in large part, credit Claimant's symptoms and accounted for them by restricting him to less than sedentary work with only one hour of standing per day and less than five minutes of walking at a time.

**2.      The ALJ's assessment of Claimant's daily activities does not require reversal.**

Although the Seventh Circuit has "cautioned ALJs not to equate such activities with the rigorous demands of the workplace," *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016) (citations omitted), "it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated," *Id.*, *quoting Loveless*, 810 F.3d at 508 (internal quotation marks omitted). Here, Claimant alleged that he can walk half a block before feeling lightheaded and can lift five to ten pounds. (R. 207). The ALJ found that Claimant's ability to "attend to his personal care tasks, travel independently, regularly attend church, and complete[] light household chores, albeit with some physical difficulty," was inconsistent with these allegations. (R. 766).

Claimant now alleges that the ALJ erred by failing to explain the inconsistencies between Claimant's daily activities and his claimed symptoms. The Court agrees that any inconsistencies between Claimant's complaints and the activities highlighted by the ALJ are not readily apparent. For example, there is no obvious contradiction between Claimant's ability to dress himself and his inability to walk more than half a block. Likewise, Claimant could theoretically engage in light chores, go to church, and use public transportation without needing to stand for more than a few minutes, walk more than half a block, or lift more than five pounds at a time. Accordingly, the ALJ's reasoning on this point is unpersuasive. *See Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015) (the ALJ wrongly emphasized claimant's driving, "fail[ing] to understand" that it was "not inconsistent with being unable to engage in substantial gainful activity"); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ should have explained the "inconsistencies" between Zurawski's activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence.").

Nevertheless, "[n]ot all of the ALJ's reasons [for discounting a claimant's symptom allegations] must be valid as long as enough of them are." *Halsell v. Astrue*, 357 Fed.Appx. 717, 722-23 (7th Cir. 2009) (emphasis in original) (upholding subjective symptom analysis despite finding that "the ALJ's reasoning [was] imperfect" because she "cited other sound reasons for disbelieving [claimant]"); *Simila*, 573 F.3d at 517 ("Though the ALJ's credibility determination was not flawless, it was far from 'patently wrong.'"). Here, the ALJ offered other reasons to support his symptom assessment, including Claimant's conservative treatment, as explained above. The ALJ also relied on the objective medical record to discount Claimant's complaints, noting that "[t]reating and examining sources regularly observed the claimant to be neurologically intact, with a normal or only slightly diminished gait, muscle strength, range of

motion in his extremities, as well as respiratory and cardiopulmonary functioning." (R. 766). Claimant does not argue that these treatment records are inconsistent with his subjective complaints. Therefore, the ALJ's reliance on Claimant's daily activities does not require reversal in this case.

### 3. The ALJ did not rely on Claimant's inconsistent accounts of his tobacco use to discount his subjective complaints.

Throughout the medical record, Claimant gave inconsistent reports regarding his history of tobacco use. At times, he reported that he had never smoked, (R. 1001-02, 1005), while at others, he reported having smoked at least half a pack per day for more than twenty years, (R. 654, 1102). Claimant now argues that the ALJ erred by relying on these "minor inconsistencies" to find Claimant's "alleged symptoms inconsistent with the record." (Dckt. #19 at 15). However, the Court finds the ALJ made no such inference. While the ALJ noted that Claimant's "reports of continued tobacco use are inconsistent with the claimant's reporting of tobacco use to treatment providers and medical examiners," in the RFC section of his assessment, (R. 759), the ALJ never tied these inconsistencies to Claimant's subjective complaints. In fact, the ALJ never drew any discernable conclusions from these inconsistent reports.

As discussed in detail above, the ALJ's decision to discount Claimant's subjective complaints did not rest on Claimant's smoking history, but rather on his conservative treatment, inconsistencies between his complaints and the medical record, and his activities of daily living. (R. 766). Because two of these reasons were well-supported, the ALJ's subjective symptoms analysis survives judicial review. *See generally Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020). ("We do not decide questions of credibility, deferring instead to the ALJ's conclusions unless 'patently wrong.'").

## CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment, (Dckt. #19), is denied and the Commissioner's motion for summary judgment, (Dckt. #25), is granted. The decision of the ALJ is affirmed.


**ENTERED:   March 29, 2023**


**Jeffrey I. Cummings**
**United States Magistrate Judge**